# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| AURORA CHICAGO LAKESHORE HOSPITAL, | )<br>)<br>) Case No. 18-cv-8162<br>) |
| Plaintiff, | )<br>) Judge Sharon Johnson Coleman |
| v. | )<br>) |
| ALEX M. AZAR, II, the Secretary of the United States Department of Health and Human Services; SEEMA VERMA, Administrator for the Centers for Medicare and Medicaid Services; CAPT. ANNA GONZALES, the Acting Regional Administrator for the Centers for Medicare and Medicaid Services, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Aurora Chicago Lakeshore Hospital ("Aurora"), brought this action against Secretary of the United States Department of Health and Human Services Alex M. Azar, II, Administrator for the Centers for Medicare and Medicaid Services Seema Verma, and Acting Regional Administrator for the Centers for Medicare and Medicaid Services Captain Anna Gonzalez (collectively "CMS"). CMS, following an investigation, reached the decision to terminate Aurora's Medicare provider agreement based on a finding that Aurora was not complying with Medicare's conditions of participation. Aurora appealed that determination administratively, and subsequently filed this suit alleging that, in deciding to terminate Aurora's provider agreement, CMS failed to comply with procedural requirements established by federal law and thereby violated its rights under the United States Constitution's Due Process Clause and the Administrative Procedures Act. Aurora now moves for a temporary restraining order and preliminary injunction to prevent CMS from terminating its provider agreement before this Court can determine whether CMS's conduct

1

with respect to that termination violated Aurora's constitutional and statutory rights. For the reasons set forth herein, that motion [6] is granted.

As an initial matter, it is important to emphasize the narrow focus of the case that is before it. Aurora, a behavioral health hospital specializing in pediatric care, has been alleged to have systematically failed to protect its patients, including minors, from physical and sexual abuse. Those extremely troubling allegations have been the subject of extensive media attention and public focus. Those allegations, however, are also not at issue before this Court, and therefore cannot be the basis for a decision on the merits of Aurora's constitutional and statutory claim. The narrow question that is presented to the Court in this case is whether, in deciding to terminate Aurora's provider agreement, CMS disregarded procedural regulations and thereby violated Aurora's procedural due process and Administrative Procedures Act rights. CMS's initial and primary focus is that the Court lacks jurisdiction.

**Background**

Aurora is an Illinois-licensed behavioral health hospital located in Chicago. It is one of the largest behavioral health providers in Illinois, with over one-hundred-and-sixty licensed beds and approximately 5,000 patients annually. Aurora's facility is also uniquely equipped to provide pediatric psychiatric care. Aurora is currently certified to participate in Medicare and Medicaid, and the vast majority of its patients are beneficiaries under those programs.

Medicare provides health insurance benefits by making payments directly to the institution or individual providing the health service or care. 42 U.S.C. §§ 1395c, 1395f. In order to receive payment for services rendered to a Medicare patient, an institution must meet the conditions of participation prescribed by the Medicare statute and accompanying regulations. If those conditions are met, the institution then becomes eligible to execute a one-year renewable provider agreement with the Secretary of Health and Human Services. 42 U.S.C. § 1395cc. Institutions certified as

Medicare providers are subject to periodic surveys by designated state agencies to ensure their compliance with federal standards. 42 U.S.C. § 1395aa; 42 C.F.R. § 405.1904.

A Medicare provider may be terminated from participation in the program if, in pertinent part, it is determined that it failed to comply substantially with the provisions of the agreement, with the provisions of Subchapter XVIII, and the regulations thereunder, or with a corrective action required under 42 U.S.C. § 1395ww(f)(2)(B). Review of decisions to terminate a Medicare provider are governed by 42 U.S.C. § 405, which provides for administrative review by the Commissioner of Social Security and, subsequently, judicial review of any final decision of the Commissioner of Social Security made after a hearing pursuant to 42 U.S.C. § 405(g). 42 U.S.C. § 1395cc(h).

The Illinois Department of Public Health conducted a complaint investigation survey at Aurora on July 27, 2018. That investigation found that Aurora was not in compliance with Medicare's Conditions of Participation regarding patients' rights (42 C.F.R. § 482.13) because (1) it failed to ensure that a patient complaint of possible sexual assault was investigated; (2) it failed to obtain informed consents from patients for psychotropic medications prior to the administration of the medications; (3) it failed to ensure that the patient's rooms were free of ligature risks from the door frames throughout the hospital; and (4) it failed to ensure that safety rounds were completed as required. It further found that at least one of those violations, the ligature risk posed by the doorframes, placed patients in immediate jeopardy. On August 1, 2018, CMS provided Aurora with notice of these findings and CMS's determination that Aurora was not in compliance with a Medicare condition at the immediate jeopardy level. CMS accordingly advised that it would be terminating Aurora's provider agreement on August 24, 2018. CMS, however, also invited Aurora to submit a "plan of correction" to immediately correct the identified violations of Medicare's conditions of participation. On August 10, 2018, Aurora submitted a plan of correction outlining the measures that it would take to address the identified deficiencies.

On August 23, 2018, the Illinois Department of Public Health conducted a second survey to determine whether the condition of immediate jeopardy at Aurora had been removed. That investigation found that Aurora remained out of compliance with Medicare conditions at the "immediate jeopardy" level because (1) it failed to ensure that patients were free from ligature risks due to wall mounted telephones with metal cords longer than 12 inches; (2) it failed to ensure adequate monitoring for a suicidal patient; and (3) it failed to ensure that the doors to public rooms were locked when not in use.

On August 28, 2018, CMS extended the previously set termination date so that it could fully review and consider the findings of the August 23, 2018, investigation. On September 12, 2018, CMS issued a final termination notice, advising CMS that it remained out of compliance with the conditions of participation, that the condition of immediate jeopardy had not been removed, and that Aurora's Medicare provider agreement would be terminated on September 28, 2018. This notice, unlike the August 1, 2018, notice, did not advise Aurora that it could file a plan of correction. Instead, it advised Aurora of its appellate rights. Nevertheless, Aurora submitted a plan of correction responding to the deficiencies cited during the August 23, 2018, investigation. Based on that submission, CMS again administratively extended the termination date.[1]

On October 10, 2018, the Illinois Department of Public Health conducted yet another survey of Aurora. That survey found that Aurora had abated the immediate jeopardy posed by ligature risks, but continued to find that Aurora was not in compliance with Medicare's patient rights conditions. The investigation found that (1) Aurora failed to obtain informed consent prior to the administration of psychotropic medication; (2) failed to ensure that patients were adequately monitored to ensure safety; (3) failed to ensure that all rooms not in use remained locked; (4) failed

---

[1] Although not referenced in the parties' briefs, the Court notes that Aurora filed a suit seeking injunctive relief on September 27, 2018, which was voluntarily dismissed the next day. *See Aurora Chicago Lakeshore Hospital v. Azar*, 18-cv-6600.

4

to ensure the types of precautions ordered were indicated on the patient observation logs and that the logs were reviewed by the nurse; and (5) failed to ensure that patient safety and observation rounds were completed every 10 minutes pursuant to policy. Accordingly, CMS sent Aurora another notice of termination, setting a termination date of November 30, 2018. This notice advised Aurora that it could submit a plan of correction, but did not advise Aurora of its appellate rights. Aurora subsequently submitted a plan of correction, which CMS accepted.

On November 13, 2018, the Illinois Department of Human Services began a post-complaint revisit survey to determine whether Aurora had rectified the previously identified violations. Concurrently, it also began an investigation into allegations of sexual and physical abuse received after the October 10, 2018, survey. The Illinois Department of Human Services completed its investigation on November 21, 2018, finding that Aurora remained non-compliant with the condition of participation concerning patients' rights, was no longer in compliance with the condition of participation governing quality assessment and performance improvement plans (42 C.F.R. § 482.21), and that the noncompliance posed immediate jeopardy to patients. These conclusions were based on findings that Aurora (1) was not compliant with applicable state and federal laws relating to the health and safety of patients as a result of its failures to report allegations of abuse; (2) failed to hospitalize a patient immediately after an allegation of sexual abuse; (3) failed to ensure that patients were free from sexual abuse; (4) failed to ensure that patients were free from physical abuse and harm; and (5) failed to ensure that adverse outcomes and incidents were monitored and tracked appropriately. In light of these violations, on November 29, 2018, CMS notified Aurora that the provider agreement would be terminated effective December 15, 2018. This letter, like the September 12, 2018, letter, did not advise Aurora that it could file a plan of correction but instead advised Aurora of its appellate rights. On December 8, 2018, Aurora

submitted a plan of correction, which CMS refused to accept, informing CMS that a plan of correction had not been requested and that no additional revisit surveys would occur.[2]

Aurora previously filed a request for a hearing with the Departmental Appeals Board appealing the September 12, 2018 final termination notice. The parties' prehearing briefs were due by the end of January 2018. On December 7, 2018, Aurora filed a second amended request for a hearing seeking review of the November 29, 2018, termination notice, as well as a request for an expedited hearing. That request had not been ruled on at the time of briefing, although CMS subsequently filed a motion to extend its pre-hearing filing deadlines (presumably extending the ultimate hearing date).

Because administrative review would not be available before the provider agreement was terminated, Aurora filed this action and immediately moved for the entry of a temporary restraining order and preliminary injunction. CMS initially requested a briefing schedule on that motion, which this Court granted on the assumption that the status quo would be maintained until briefing had been completed. CMS, however, subsequently objected to the Court's order maintaining the status quo during the pendency of the briefing, based on its assertion that this Court lacked jurisdiction to confer Aurora with any equitable relief. The Court accordingly expedited the briefing schedule on Aurora's motion for a temporary restraining order and preliminary injunction, and CMS agreed to refrain from terminating Aurora for one additional week. That period expires tomorrow.

---

[2] The Court notes that this case has been needlessly complicated by the defendants' issuance of multiple ambiguous notices of termination, notices of final termination, seemingly unexplained extensions of termination deadlines, and decisions to accept remedial efforts following notices of final termination. These unexplained actions gave rise to the "back and forth" that CMS now complains of and created a course of conduct that no doubt justified Aurora in its belief that it would once again be given an opportunity to correct the deficiencies noted in the November 29, 2018, notice of termination.

**Legal Standard**

A party seeking a preliminary injunction or temporary restraining order must demonstrate that (1) its claim has some likelihood of success on the merits; (2) traditional legal remedies would be inadequate; and (3) absent injunctive relief, it will suffer irreparable harm in the period prior to final resolution of its claims. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.,* 549 F.3d 1079, 1085 (7th Cir. 2008). If the moving party satisfies these threshold requirements, the Court must balance the threatened injury to the moving party with the threatened harm the injunctive relief may inflict on the non-moving party. *Id.* The Court also must consider the public interest in either the grant or the denial of the injunctive relief. *Id.* In applying this criteria, the Court uses a "sliding scale" approach: if a claim is very likely to succeed on the merits, less harm to the plaintiff will be required to justify injunctive relief and vice versa. *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 12 (7th Cir. 1992).

As a threshold matter, however, this Court must find that it has subject matter jurisdiction to take any action with respect to this case. A federal court's authority to hear a case—its subject matter jurisdiction—is limited, and a court has an independent obligation to inquire into its own subject matter jurisdiction before acting in a case. *See Thomas v. Guardsmark, LLC,* 487 F.3d 531 (7th Cir. 2007); *Weaver v. Hollywood Casino-Aurora, Inc.,* 255 F.3d 379, 381 (7th Cir. 2001). If there is no jurisdiction, the case must be dismissed, because "[n]o court may decide a case without subject matter jurisdiction." *United States v. Tittjung,* 235 F.3d 330, 335 (7th Cir. 2000).

The party asserting federal jurisdiction bears the burden of proof to establish that jurisdiction is proper. *Travelers Prop. Cas. v. Good,* 689 F.3d 714, 722 (7th Cir. 2012). When subject matter jurisdiction is disputed, the district court may look beyond the jurisdictional allegations of the complaint and consider whatever evidence has been submitted on the issue to determine whether in

7

fact subject matter jurisdiction exists. *Miller v. Fed. Deposit Ins. Corp.*, 738 F.3d 836, 840 (7th Cir. 2013) (internal quotation marks and citations omitted).

**Discussion**

CMS contends that this Court lacks subject matter jurisdiction to hear Aurora's claims because Aurora has not exhausted its administrative remedies. It is undisputed that, ordinarily, a final administrative decision on Aurora's claims would be a "statutorily specified jurisdictional prerequisite" to suit in this Court.[3] *Weinberger v. Salfi*, 422 U.S. 749, 766, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). Aurora, however, contends that it is subject to an exception to the administrative exhaustion requirement.

The Supreme Court, in *Matthews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) recognized that Courts may waive the exhaustion requirement where (1) the claimant raises a colorable constitutional challenge entirely collateral to his claim of entitlement and (2) the claimant's interest in having the issue resolved promptly is so great that deference to the agency's judgment is inappropriate.[4] *Id.* at 330; *Northlake Community Hospital v. United States*, 654 F.2d 1234, 1241 (7th Cir. 1981). CMS argues that *Eldridge* actually imposes three requirements for waiver of the exhaustion requirement, adding another requirement that exhaustion "serve no useful purpose" or be futile. CMS however, has identified no binding precedent establishing that this Court is required to consider the futility of exhaustion and has offered no persuasive argument as to why this Court should do so.

In order to satisfy *Eldridge's* requirements for waiver, Aurora must first establish that it raises a colorable constitutional challenge entirely collateral to its claim of entitlement. CMS, relying on

---

[3] Federal question jurisdiction under 28 U.S.C. § 1331 is not available to plaintiffs bringing claims arising under Title II of the Social Security Act. *Weinberger v. Salfi*, 422 U.S. at 760–61; *see also Northlake Community Hospital v. United States*, 654 F.2d 1234, 1240 (7th Cir. 1981).
[4] *Eldridge* also imposed a non-waivable presentment requirement, but there is no dispute that this requirement has been satisfied here.

8

*Northlake Community Hospital*, contends that the Seventh Circuit has conclusively found that claims such as Aurora's "do not rise to the level of colorable constitutional claims and could not confer subject matter jurisdiction on the district court." CMS's argument mischaracterizes *Northlake*. *Northlake* was decided based on the plaintiff's failure to adduce sufficient record evidence to demonstrate a colorable constitutional claim. As is relevant here, the *Northlake* court held that the plaintiff could not establish a colorable claim based on their inability to submit a plan of correction because the plaintiff had been given six months to submit a plan of correction with respect to multiple grounds for termination and had failed to do so. *Id.* at 1244–45. *Northlake* does not establish that claims such as Aurora's can never succeed, but instead requires an independent factual analysis into whether a colorable constitutional claim has been stated.

CMS also relies on *Ancillary Affiliated Health Services, Inc. v. Shalala*, 165 F.3d 1069 (7th Cir. 1999), which it contends held that claims of regulatory and due process violations do not excuse the plaintiff's failure to exhaust. However, that case did not involve a jurisdictional argument premised on *Matthews v. Eldridge*. Instead, *Ancillary* and the cases that it relied on resolved jurisdictional arguments claiming that exhaustion was not required because the plaintiff's procedural challenges did not "arise under" the Medicare Act and therefore were not subject to the jurisdictional limitations of section 405(h) in the first instance. *See Ancillary*, 165 F.3d at 1070; *Homewood Professional Care Center, Ltd. v. Hecker*, 764 F.2d 1242, 1252–53 (7th Cir. 1985). Although it is true that in *Sunrise Healthcare Corp. v. Shalala*, 50 F. Supp. 2d 830 (S.D. Ill. 1999) the Southern District of Illinois subsequently applied *Ancillary* to a post-termination challenge under the Medicare Act asserting jurisdiction under *Eldridge*, that case was distinguishable because it was premised on a challenge to the Secretary's statutory authority to terminate absent a finding of immediate jeopardy, a claim which is not collateral in nature. *Cathedral Rock of North College Hill, Inc. v. Shalala*, 223 F.3d 354, 362–63 (6th Cir. 2000) (holding that claims challenging termination based on the absence of a

finding of immediate jeopardy are not collateral in nature). *Sunrise*, moreover, made no acknowledgment of the distinction between jurisdictional arguments premised on *Matthews* and those challenging the general application of section 405(h).

The most helpful case that CMS offers is *Cathedral Rock of North College Hill, Inc. v. Shalala*, 223 F.3d 354 (6th Cir. 2000). In that case the Sixth Circuit, faced with a number of unreviewed district court opinions finding jurisdiction under *Eldridge*, offered a clear explanation of the boundary between collateral and non-collateral challenges.

> In *Eldridge*, an individual brought suit in federal court claiming that under the Due Process Clause of the Constitution he was entitled to a hearing before his benefits were terminated, which the Supreme Court concluded was an entirely separate claim from his substantive challenge to the termination of his benefits. The individual's constitutional claim regarding his procedural rights involved an analysis of the Supreme Court's jurisprudence on the Due Process Clause, which involved completely separate issues than his challenge to the Secretary's decision to terminate benefits.
>
> The district court opinions allowing jurisdiction under the "entirely collateral" exception reason that where a party's challenge to the Secretary's authority to terminate a provider agreement presents a legal question involving general statutory analysis, it is collateral to a claim challenging the Secretary's decision to terminate the agreement based on the particular facts of the case. A party's characterization of its challenge to the Secretary's termination of a provider agreement as a purely legal or statutory question, however, is not sufficient by itself to constitute an "entirely collateral" claim. For example, we have concluded that where an ambulance provider makes the legal argument that the Secretary violated the Medicare regulations and the Due Process Clause in determining that certain vehicles do not qualify as ambulances for the purpose of Medicare reimbursement, this challenge is "inextricably intertwined" with the party's claim that it is entitled to benefits for its ambulance service. Such a claim is "inextricably intertwined" because if the ambulance provider were successful in reversing the Secretary's determination, then it would be entitled to increased benefits for its vehicles. To conclude otherwise would allow any party to avoid the Medicare Act's administrative procedures for reviewing the Secretary's determinations simply by making purely legal constitutional or statutory arguments. Rather, a court must examine whether the allegedly collateral claim involves completely separate issues from the party's claim that it is entitled to benefits or continued participation in the Medicare program or

10

> whether it is inextricably intertwined with its substantive claim to benefits or participation.

*Id.* at 363 (internal citations omitted). Thus, the Sixth Circuit held that a claim challenging a provider agreement termination on the ground that there was not a finding of immediate jeopardy was not collateral because it was intertwined with the merits of the termination decision. The court further held that a claim challenging the termination based on the lack of a pre-termination hearing was entirely collateral to the substance of the decision. *Id.*

Here, Aurora is bringing claims pursuant to the Due Process Clause and the Administrative Procedures Act based on CMS's "failing to follow its own procedures regarding the termination of Aurora's Medicare Provider Agreement." Specifically, Aurora appears to contend that CMS did not give Aurora notice or the opportunity to take corrective action, as it contends is required by 42 C.F.R. § 488.28. That section provides that if a provider is found to be deficient in one or more of the standards in the conditions for participation, it may participate in or be covered under the Medicare program only if the provider or supplier has submitted an acceptable plan of correction to achieve compliance within a reasonable period of time. 42 C.F.R. § 488.28(a). It further provides that if a provider is not in compliance with one or more of the standards, it is to be granted a reasonable time to achieve compliance based on the nature of the deficiency and a judgment as to the facility's capabilities to provide safe and adequate care. 42 C.F.R. § 488.28(c).

Aurora claims that under the Due Process Clause and the Administrative Procedures Act it was entitled to have CMS comply with these regulations conferring it with an opportunity to be heard and to attempt to cure any identified deficiencies in its compliance. Aurora's constitutional and statutory entitlement to these procedures is not the subject of its administrative appeal, and a final decision by the agency therefore would not answer Aurora's challenge to the deprivation of its procedural rights. Aurora, similarly, does not ask this Court to review the results of the November 21, 2018, survey or to otherwise make any ruling as to the propriety of termination in light of those

findings. Under these circumstances, it is appropriate to find that Aurora's Due Process and Administrative Procedures Act claims are entirely collateral from its underlying administrative challenge to termination. *Ram v. Heckler*, 792 F.2d 444, 446 (4th Cir. 1986); *see also Papendick v. Bowen*, 658 F. Supp. 1425, 1432 (W.D. Wis. 1987) (finding a due process claim based on the Secretary's failure to comply with regulatory procedures to be collateral because "plaintiff does not seek to have this Court decide that the Secretary does not have cause to terminate his participation in the Medicare program, but rather seeks to have this Court decide that the Secretary has not afforded the plaintiff due process prior to terminating his participation in the Medicare program."); *Robie v. Price,* No. 17-cv-03089, 2017 WL 3188572, at *3 (S.D. W.Va. July 26, 2017) (holding that due process claims challenging pre-termination procedures were collateral to the substantive merits of the agency determination). Although, as previously discussed, CMS opposes the exercise of jurisdiction in light of *Northlake* and *Ancillary*, its analysis does not contain any caselaw specifically addressing whether a procedural due process claim based on regulatory non-compliance is collateral to the underlying administrative action. Indeed, *Northlake* appears to have focused on whether a colorable claim had been stated thereby assuming that a claim identical to that brought here was collateral.

Even if a constitutional claim is entirely collateral to a challenged decision, *Northlake* requires that the claim must be colorable before jurisdiction may be asserted. *Northlake*, 654 F.2d at 1241. Unlike in *Northlake*, CMS does not contend that the facts undermine Aurora's claims. Nor does it challenge that, under the procedural due process clause and the Administrative Procedures Act, Aurora would be entitled to relief if it is correct that CMS violated regulatorily required procedures. Instead, CMS challenges Aurora's reading of the regulations. CMS, however, has substantially failed to address the merits of Aurora's regulatory interpretation. In challenging the merits of Aurora's claims, CMS offers only two brief paragraphs of analysis, unsupported by citation to any caselaw or other interpretation of the regulations at issue. In fact, CMS does not even engage in a cursory

analysis of the regulations in question; instead, it simply states its interpretation of the regulations and cites to the underlying section of the Code of Federal Regulations. CMS's conclusory and unsubstantiated interpretations of the relevant regulations are not persuasive, and the Court therefore finds that Aurora has presented a colorable claim. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (recognizing that it is not the Court's job to construct the parties' arguments for them). Accordingly, based on its facial review of the regulations at issue this Court concludes that, at present, Aurora has presented a colorable claim.

As the final matter in its analysis under *Eldridge*, this Court must consider whether Aurora's interest in having this particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate. Here, Aurora has presented evidence establishing that it will be irreparably harmed if injunctive relief is not entered. Aurora's administrative appeal is not due to be resolved until after its termination as a Medicare provider would be completed. Although the numbers offered have varied, it is undisputed that the vast majority of Aurora's patients are part of the Medicare or Medicaid programs, and that those patients would be lost in the event of a termination. Aurora has represented that it would subsequently be rendered insolvent and forced to close, likely destroying any continuing relationship with Aurora's remaining private patients. Aurora, moreover, has represented that even the act of termination will cause staff to begin seeking other employment, costing Aurora skilled employees that would be difficult to replace. Although CMS appears to contend that these harms can be offset by monetary payment, at this juncture the Court is not convinced that the harms contemplated would be readily monetizable.

CMS, in a somewhat novel argument, also contends that any harm resulting from Aurora's termination is Aurora's own fault for predominantly accepting patients on Medicare and Medicaid and thus failing to diversify its income stream. It is true, perhaps, that "participation in Medicare involves a degree of risk which increases directly with the percentage of patient services paid for

with government funds; the economic rule which instructs that diversification decreases risk does not stop working just because the government becomes involved." *Livingston Care Ctr., Inc. v. United States*, 934 F.2d 719, 721 (6th Cir. 1991). *Eldridge*, however, does not appear to require a determination as to whose "fault" the need for a prompt resolution of a collateral claim is, and CMS has not identified any binding authority requiring this Court to retroactively opine on how Aurora should have conducted its business affairs. The Court, moreover, finds it distasteful that the government appears to suggest, in a court filing, that health care providers should turn away Medicare recipients in order to diversify their income streams against the "risks" of participation in the Medicare program. Whatever Aurora's past decisions, the fact remains that if Aurora is terminated from Medicare it will be forced to close and will lose patient relationships and skilled employees. Aurora has therefore convincingly demonstrated an interest in the prompt resolution of its Due Process and Administrative Procedures Act claims based on the irreparable harm that will result if its provider agreement is terminated. In light of this demonstrated harm to Aurora, the Court agrees that deference to the agency's judgment is inappropriate in this instance. Accordingly, the Court concludes that administrative exhaustion is waived under *Eldridge*, and proceeds to consider the elements of injunctive relief.

In order to state a claim for injunctive relief, a plaintiff must establish that (1) its claim has some likelihood of success on the merits; (2) traditional legal remedies would be inadequate; and (3) absent injunctive relief, it will suffer irreparable harm in the period prior to final resolution of its claims. *Girl Scouts of Manitou Council v. Girl Scouts of the United States of America, Inc.,* 549 F.3d 1079, 1085 (7th Cir. 2008). Here, the Court has already found that Aurora will be irreparably harmed if injunctive relief is not granted and that traditional legal remedies will be inadequate to rectify that harm. Aurora has also plausibly established that its claims for relief have some likelihood of success on the merits, without any substantial arguments to the contrary. Aurora's claims, as previously

hinted, involve the interpretation of a complex regulatory framework and the ever-present balancing between a plaintiff's interest in procedural protections and the government's interest in finality following repeated violations of Medicare's conditions of participation. Those difficult questions require careful consideration and the parties' arguments, especially CMS's primary focus on jurisdictional matters, offer little guidance to this Court on how Aurora's claims should be decided. Accordingly, the Court concludes that Aurora has established that it has at least some likelihood of success on the merits.

The Court accordingly turns its attention to the harm that injunctive relief would inflict on the non-moving party and, here, the weight of the public interest. *Id.* The reasons that the government cites for terminating Aurora's provider agreement cause this Court substantial concern. The governments' November 21st investigation found systemic failures to protect patients from what, by all accounts, appears to have been rampant physical and sexual abuse. The judicially sanctioned perpetuation of these conditions would be unthinkable and is not one the Court's ruling contemplates.

The right that Aurora seeks to vindicate through this litigation is not the right to operate in disregard of its patients' wellbeing. Aurora only claims that CMS was legally obligated to give it an opportunity to fix its shortcomings by filing a plan of correction and then receiving a reasonable period of time to implement those corrections to eliminate the identified violations of Medicare's conditions of participation. Aurora has already submitted a plan of correction, which CMS declined to consider, and, based on the representations of counsel, has already corrected the most serious systematic failures identified by the November 21st investigation.

If injunctive relief is granted by this Court, it would not preclude CMS from terminating Aurora's provider agreement. Aurora does not claim that its provider agreement cannot be terminated. Instead, it only claims that the November 29th termination notice violates its

constitutional and statutory rights because it was issued without the opportunity for Aurora to file a plan of correction and fix the identified deficiencies. Aurora has since had those opportunities, and any subsequent effort to terminate Aurora based on a violation previously raised in the November 29th notice of termination therefore would not be foreclosed by the procedural challenges that Aurora has presented to this Court. Put another way, if CMS finds that Aurora is continuing to place patients at risk of physical or sexual abuse, this Court's order will in no way prevent CMS from seeking to terminate Aurora's provider agreement.

In light of CMS's continuing ability to police the care that Aurora provides to ensure the wellbeing of patients and to immediately initiate the termination process in the event of continuing violations of Medicare's conditions of participation, as well as the countervailing irreparable harm to Aurora that would result from its termination, the Court does not believe that there is a risk of harm to CMS or to the public's interest that precludes injunctive relief in the present case. Accordingly, the Court holds that Aurora has satisfied the elements necessary to warrant a preliminary injunction.

**Conclusion**

For the foregoing reasons, the Court grants Aurora's motion for a temporary restraining order and preliminary injunction [6]. Until further order of this Court, CMS is enjoined from terminating Aurora's Medicare provider agreement pursuant to the November 29, 2018, final termination notice (as voluntarily extended in Court to December 21, 2018). The Court expects that CMS, through its agents, will continue to closely monitor Aurora's compliance with Medicare's Conditions of Participation and will swiftly initiate termination proceedings should it find that a

recurring violation of Medicare's Conditions of Participation has occurred. A status hearing is set for 12/27/2018 at 9:00 AM to determine how the parties wish to proceed in resolving the merits of Aurora's claims.

IT IS SO ORDERED.

Date: 12/21/2018

Entered: _____
SHARON JOHNSON COLEMAN
United States District Court Judge